Smith *v.* State Workmen's Insurance Fund et al., Appellants.

Argued May 6, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

134

*S. H. Torchia,* with him *Charles J. Margiotti,* Attorney General, *John T. J. Brennan* and *Lawrence F. McGrath,* for appellants.

*Russell R. Yost* of *Graham, Yost & Meyers,* for appellee.

OPINION BY STADTFELD, J., July 15, 1937:

This is an appeal by defendants from a judgment in favor of claimant on an award in a workmen's compensation case.

The award was based upon findings of fact to the effect that the claimant's husband, while in the employ of the Vinton Colliery Company, defendant, as a pump man received an electric shock which caused a cerebral hemorrhage and resulted in his death.

As stated in the opinion of the Board, defendant contends there is not sufficient competent testimony upon which to find that the claimant's husband received an electric shock, because the testimony introduced to prove this was hearsay testimony. It also contends that the claimant's death was due to cerebral hemorrhage which was not superinduced by an electric shock, and that his death was due to natural or constitutional conditions in no way related to an accident.

The burden of proving that decedent's death was due to an accident sustained while in the course of

his employment is upon claimant: *Seitzinger v. Ft. Pitt Brewing Co.*, 294 Pa. 253, 144 A. 79; *McMahon v. Edw. G. Budd Mfg. Co.*, 108 Pa. Superior Ct. 235, 164 A. 850.

It was agreed on both sides that decedent died from a cerebral hemorrhage. The controlling question is whether or not decedent received an electric shock which caused the same.

Quoting from the opinion of the Board: "The testimony of Mr. Moore, a fellow employe called on behalf of the claimant, was to the effect that he reported for work June 15, 1935, at six o'clock in the morning and waited for the claimant's husband, the decedent, to appear in order to replace him at work, and waiting a while, he became suspicious that something had happened to the decedent and therefore, got on his motor and rode into the mine and found the decedent lying in the center of two sets of tracks and alongside his motor; that he then picked him up, and while doing so, the decedent muttered: 'I am sick—I am sick......' and then lapsed into unconsciousness. He then placed the decedent on his motor and took him out of the mine to a Doctor MacFarlane. He returned to the mine to examine the location where he found the decedent, which was about one quarter of a mile from a pump which had stopped, either automatically or was stopped by the decedent by pulling a pump switch, and that this was the last pump the decedent had visited. He further testified that where the decedent's motor was, there were two sets of tracks on each of which a motor could be operated which received electric power from wires about 5½ feet above each track, the electricity of which was transmitted to the motor by means of a trolley pole, and that the trolley pole to the decedent's motor was 'dogged' or extending into the air without contact with the wire, and that it appeared that the trolley pole was being transferred from

one wire to another wire in order to operate the motor on the other set of tracks, and that these wires carried 275 volts......We are of the opinion that the Referee properly found that the decedent did suffer an electric shock causing a cerebral hemorrhage which resulted in death for the reasons hereinafter stated. It is true that the nearest pump was about a quarter of a mile away from where the decedent was found, but there is no testimony showing positively that, if he were to receive an electric shock, it must necessarily be at this pump switch. Its location did not make it incumbent upon the Referee to find that this pump switch was the only place at which the decedent could have received an electric shock. It must be remembered that the decedent was found lying between two sets of tracks and along side his motor, and that there were wires for each track $5\frac{1}{2}$ feet high carrying 275 volts each. It could reasonably be inferred by the Referee that the decedent received an electric shock while transferring or switching the trolley pole from one wire to another. There are several ways in which the decedent could have received the electric shock, and in view of the utterances of the decedent coupled with the surrounding circumstances, the Referee could properly make a fair inference that the decedent did receive an electric shock."

Claimant testified that her husband was apparently in good health prior to June 15, 1935, and had worked steadily; that she saw him at Dr. MacFarlane's office after the accident and that he was unconscious at the time and when he was sent to the hospital.

The Referee found, inter alia (affirmed by the Board) : "Fourth (b) : That during the decedent's stay in the hospital, he was attended and examined by several physicians one of whom was a neurologist and a diagnosis of spontaneous cerebral hemorrhage with left-side hemiphlegia was made; that the examination

of the decedent revealed that he had a chronic arterio-sclerosis; that upon admittance to the hospital, the decedent remained unconscious for two or three days at the end of which time he regained consciousness for a short time; that immediately upon regaining consciousness he spoke to his wife and began talking about switches—'was pulling a switch and it jerked my arm and then I don't remember what happened'; that the decedent at this time or shortly thereafter was heard to remark to his brother-in-law and also by fellow patient in the hospital in a nearby bed, 'I was pulling an electric switch and it knocked me, and I can't remember anything after that;' also, 'that he touched this switch and it knocked me.' "

The testimony of the witnesses as to the alleged declarations by the decedent after regaining consciousness were objected to by counsel for the defendant as hearsay and incompetent, but were admitted by the Referee over said objections.

The Referee and the Board were of the opinion that these declarations were part of the res gestae and therefore found from inference that this unusual occurrence consisted of an electric shock.

Most of the doctors who testified stated that decedent had a chronic sclerotic condition which could result in a cerebral hemorrhage even though decedent did not subject himself to any exertion.

All of the doctors who examined decedent could find no evidence of burns or any mark indicating that the body had been contacted by electricity. Some of the doctors testified that if decedent did suffer an electric shock, the cerebral hemorrhage would result from it.

No post mortem examination of decedent was made.

Counsel for appellee frankly concedes that unless claimant can rely upon decedent's declarations made at the hospital when he regained consciousness, there is no affirmative evidence that he received an electric

shock. If the electric shock was received at any other point than at the pump-switch which was located a quarter of a mile away from where the body was found, it was most important that the inquiry should have been directed as to any other point where he might have received an electric shock, particularly in view of the comments of the Board on this proposition. We do not think that this matter was sufficiently developed at the hearing.

In view of our present disposition of this case, we are not passing on the competency of the alleged declarations of the decedent as being part of the res gestae. We are of the opinion that in fairness to both sides, the case should be returned for further hearing on the line indicated.

The assignment of error is sustained and the record is remitted to the court below with directions to send the same back to the Board for further proceedings not inconsistent with this opinion.